Argued December 9, 1919, modified January 27, modified on petition for rehearing and rehearing denied June 15, 1920.

# HARTMAN v. PENDLETON.*

(186 Pac. 572; 190 Pac. 339.)

### Charities—Ambiguity as to Beneficiary Latent.

1. Any ambiguity as to beneficiary of bequest in trust to use the income for benefit of the library of the Commercial Association of Pendleton, of the City of Pendleton, Or., is latent.

### Charities — Extrinsic Evidence as to Beneficiaries Intended Inadmissible.

2. Under the rule that, where the language of a will is clear and of well-defined force and meaning, extrinsic evidence of intent is inadmissible to explain, enlarge, or contradict such language, the bequest being in terms for the library of the Commercial Association of Pendleton, of the City of Pendleton, if when the will was executed there existed an organization known by that name, and it owned a library, it may not be shown that the Pendleton Public Library was intended to be the beneficiary.

### Associations—May Take and Hold Personal Property.

3. Unincorporated associations may take and hold personal property, at least to the extent that persons giving or selling the same to it may not retake or otherwise dispose of it.

### Charities—No Latent Ambiguity as to Beneficiary Under Evidence.

4. Evidence *held* to show that at the time of making of a will making a bequest in trust for the benefit of the library of the Commercial Association of Pendleton such association owned a library, so that there was no latent ambiguity as to the beneficiary.

### Charities—Trustees Authorized to Make Purchases for Library.

5. A bequest to trustees of money to be invested by them and the income "to be used by them for the benefit of the library" of a certain association does not require them to pay the income to the association, but they may select and purchase the books or supplies.

### Charities—"Annual Income" to be Used by Trustee Means Annually.

6. Under bequest to trustees of money to be invested by them "and the annual income * * to be used by them" for the benefit of a certain library, it is their duty to apply the income annually, and not accumulate it.

### Charities—Trustee not Chargeable With Costs.

7. A testamentary trustee of a fund for the benefit of a library, having with two claimants thereof refused to pay the income to the one entitled, but accumulated, not acting in bad faith, but on

---

*On the question of enforcement of general bequest for charity or religion, see note in 14 L. R. A. (N. S.) 49.     REPORTER.

his honest conviction, should not be charged with the costs of the suit to determine right; it being a case which could not be decided at first blush, but only with the most careful deliberation.

### ON PETITION FOR REHEARING.

**Charities—Action—Accumulated Funds—Treated as Capital.**

8. Where, owing to controversy as to who was beneficiary of a library fund, intended annual expenditures were halted and accumulations not expended, so that the amount accrued, not including the principal, aggregates more than double the amount of the original fund, such fund will not be used all at once in the purchase of books, thus leaving the library to depend on a small income provided by an amount of $5,000 bequeathed for its support, but the whole amount will be treated as principal, and the annual income applied to purchase of books and supplies.

[As to gift for public works as valid charitable gift, see note in **Ann. Cas.** 1914A, 1218.]

From Umatilla: GUSTAV ANDERSON, Judge.

Department 1.

This is a suit primarily to have interpreted a certain clause in the will of Samuel P. Sturgis, deceased, and arises out of the following circumstances:

On the seventh day of January, 1896, Samuel P. Sturgis executed in due form a will containing the following provision:

"I give and bequeath to James A. Fee and Edward D. Boyd, as trustees, the sum of Five Thousand ($5,000.00) Dollars in trust, to be invested by them and the annual income derived therefrom to be used by them for the benefit of the library of the Commercial Association of Pendleton, of the City of Pendleton, Oregon, but if from any cause said Commercial Association of Pendleton ceases to exist for a period of three years, then all of said five thousand dollars shall revert to my estate and become the property of my wife, Lina H. Sturgis, in fee simple."

A month later Samuel P. Sturgis died from the sickness from which he was suffering when the will was executed.

We have now practically two claimants to the benefits of this bequest, namely: the City of Pendleton, for the purpose of its municipal library, and the Commercial Association of Pendleton, for the benefit of its library.

The Commercial Association of Pendleton claims that it is the beneficiary under the terms of the will, while the defendants claim that the Pendleton Public Library, at present a municipal institution of the city, is the beneficiary. The surviving trustee under the will, taking the latter view and desiring to expend the income of the trust funds for the purposes of the library of the Pendleton Public Library, the Commercial Association, by its library committee duly authorized so to do, commenced this suit to have the will interpreted, making the City of Pendleton, the members of its library board and Judge James A. Fee, the surviving trustee, parties defendant, all of whom answered setting up the claim of the Pendleton Public Library to the bequest.     MODIFIED.

For appellants there was a brief with oral arguments by *Mr. James A. Fee, Mr. Richard W. Montague* and *Mr. Stephen A. Lowell.*

For respondents there was a brief over the name of *Messrs. Raley & Raley,* with an oral argument by *Mr. James H. Raley.*

McBRIDE, C. J.—This suit is not brought to correct an alleged mistake in the will of Samuel P. Sturgis. The plaintiffs claim that the testator made a perfect will, making it the beneficiary, and allege that defendants claim a different interpretation, whereupon it asks that the true purpose and intent

of the document be judicially declared. The defendants, on the other hand, claim that the Pendleton Public Library was the beneficiary and that there are ambiguous terms used, and ask a decree construing the will to mean that the trust fund therein provided was bequeathed to and belongs to the Pendleton Public Library, and that the same is the property of the people of the City of Pendleton.

1. If there is any ambiguity in the terms of the will it is latent and not apparent on the face of the instrument. Anyone ignorant of local conditions and controversies would, upon reading the clause in dispute, at once conclude that, (1) there was at the time an organization known as the Commercial Association of Pendleton; (2) that it had a library, (3) that its *habitat* was the City of Pendleton, Oregon, and (4) that it was the intent of the testator that the trustees named in the will should expend the income of the fund so bequeathed for the benefit of that library. If the first three of these conditions actually existed the fourth necessarily follows as a matter of law.

2. Before considering the testimony in the instant case, it may be well to advert to some firmly established principles laid down for the construction of wills, because there is no branch of judicature which, beyond this, so much requires adherence to those rules which the wisdom and experience of generations have developed.

The remark of TINDAL, C. J., in *Clarke* v. *Ludlam,* 7 Bing. 279, is one of universal application:

"I agree in the necessity of adhering to general rules in the construction of wills and other instruments. It is expedient that such rules should be held sacred, because they withdraw the decision from the discretion of the individual judge, and pre-

vent him from pursuing his own views of each particular case. And there is less inconvenience in the hardship which may sometimes be occasioned by a strict adherence to the rule than in the confusion which must follow on departing from it.''

One of these rules is this: Where the language employed in the will is clear, and of well-defined force and meaning, extrinsic evidence of what was intended in fact cannot be adduced to explain, qualify, enlarge or contradict this language, but the will must stand as written.

Applied to the concrete case, if there was in fact in Pendleton, Oregon, a library of the Commercial Association of Pendleton, extrinsic evidence cannot be introduced to show that the testator intended that ''The Pendleton Public Library'' was to be the beneficiary. The pivotal question in this case, therefore, is: Was there in existence at the time this will was executed an organization known as the ''Commercial Association of Pendleton,'' and did it own a library? If these two facts existed they settle the contention in favor of the plaintiff. If either is wanting, then it will be proper rather than the bequest should be allowed to fail because of an equivocal description, for the court to seek in extrinsic evidence an interpretation of the testator's intention.

Thus, *In re Taylor,* 34 Ch. D. 255, where the testator devised property to ''My cousin Harriet Cloak,'' when in fact a cousin of that name had been married and no longer bore it and there was another Harriet Cloak, the wife of a cousin of the testator, parol evidence was admitted to show that the latter was the person for whom the legacy was intended.

And in *Gilmer* v. *Stone,* 120 U. S. 586 (30 L. Ed. 734, 7 Sup. Ct. Rep. 689, see, also, Rose's U. S.

Notes), where a residuary estate was given for equal division "between the Board of Foreign Missions and the Board of Home Missions," and it appeared that there were such boards in various religious denominations, evidence was admitted to show that the testator, being a zealous Presbyterian, must have intended the bequest for boards of that denomination.

On the other hand, if there is in existence a party of the name designated in the will, extrinsic evidence will not be admitted to show that another party with a different though closely similar name was intended.

Thus in *Tucker* v. *Seaman's Aid Society*, 7 Metc. (Mass.) 188, where one Nathaniel Tucker gave a legacy to "The Seaman's Aid Society in the city of Boston," another society, "The Seaman's Friend Society," in the same city claimed the legacy and offered evidence to prove that the testator had no knowledge of the existence of the society named in his will; that he knew of the existence of said other society, was deeply interested in its objects, and had contributed to its funds and had frequently expressed a determination to give it a legacy; that he directed the scrivener who wrote his will to insert the legacy, as made to said society; that the scrivener, not knowing the existence of said society, told the testator that the name of the society was the "Seaman's Aid Society" and the testator thereupon submitted to having that name inserted. The Supreme Court held the evidence to be inadmissible and sustained the bequest as it appeared in the will. The opinion of Chief Justice SHAW completely covers every phase of the proposition here discussed, and it is unnecessary to cite other precedents.

It being conceded in this case, that when the will was executed there was in existence in the City of

Pendleton an organization known as the "Commercial Association of Pendleton," we pass to the vital proposition in this case. Did the association at the time have a library? We must, from the terms of the bequest, assume that the testator thought there was a library connected with the association because the bequest is conditioned upon the continued existence of the Commercial Association. The testator says:

"If, from any cause, said Commercial Association of Pendleton ceases to exist for a period of three years, then all said five thousand dollars shall revert to my estate."

This is not the language of a man making a gift to the general public. If the Commercial Association was not the ultimate party to be benefited, why make the bequest contingent upon the continued existence of that association. If a testator makes a bequest in favor of A., it would not be unnatural that he should provide that in case of A.'s death, the money should revert to the testator's estate, but if the bequest should be made to A. with the provision that it should revert in case of the death of a stranger, the sanity of the testator would be questioned.

Here the bequest is a Siamese twin to the Commercial Association. It dies with it or at least as soon thereafter as the lapse of time has demonstrated that the association is dead beyond revival. To the writer this is strong evidence that the ultimate benefit of the bequest was intended for the Commercial Association, and that while no doubt the testator expected and hoped the people of Pendleton would share in that benefit, he expected that benefit to flow through the channel of the Commercial Asso-

ciation and not otherwise. He thought, and nobody was perhaps better acquainted with the facts, that the Commercial Association and not the public generally owned a library, and that through the trustees he had appointed that library would be kept up primarily for the benefit of the association and incidentally perhaps for the general public.

3. We take it to be fairly well-settled law, at least by the better authorities, that an unincorporated association may take and hold personal property at least to the extent that the person giving or selling such property to it cannot retake it or otherwise dispose of it; so that if one gave a book, or money to buy a book, to the Commercial Association for its library, that person could not retake the book or reclaim the money on the pretext that the donee was incapable of holding it. Such associations would be treated in equity as *quasi* partnerships, each member of which would be entitled to an interest in the property donated or purchased: 5 R. C. L. 312; *Whipple* v. *Parker,* 29 Mich. 369; *Curtis* v. *Hoyt,* 19 Conn. 154 (48 Am. Dec. 149); *Snowden* v. *Crown Cork & Seal Co.,* 114 Md. 650 (80 Atl. 510, Ann. Cas. 1912A, 679), and note to case, as reported in the last-mentioned work. There is not a solitary reason for the holding of some courts that gifts to nonincorporated associations are invalid, except blind adherence to outworn precedents.

The capacity of the Commercial Association of Pendleton to found a library being established, we now advert to the testimony relative to the actual existence of such a library at the time the will in question was executed. The first mention of a library in connection with the work of the Commercial Association, is found in its minutes of March 24,

1894, where it is recorded that the chair announced, among other matters, as one of the objects of the meeting that it was proposed to take up the matter of establishing a library, and the further recital that "all matters were placed under discussion and fully considered."

The discussion may have had some effect for on April 3, 1894, we have a statement in the address of Colonel Boyd, President of the Association, to this effect:

"In addition to all this a cabinet has just been placed in the middle room of the Association for the reception of books and periodicals, which it is desired to present, thus making a beginning for a library which is much needed in the city. Mr. C. S. Jackson has lately donated to the Association complete files of the Congressional Record for several years past and up to date, together with many valuable books for which he has placed this Association under obligation."

So far as the testimony shows, this donation of Mr. Jackson was the first thing beyond mere talk that occurred in the direction of establishing a public library in Pendleton, and it seems fair to assume that the books given by him were intended to become the property of the association. That he hoped and expected from this little beginning and the efforts of himself and others a library would develop which would, under the management of the association, be valuable to the association and of use to the general public, is apparent from his testimony, and while he perhaps did not give a thought as to where the legal title to the books presented by him would technically vest, it is plain he regarded the association as the donee.

On the same day that Colonel Boyd's address was delivered, to wit, April 3, 1894, an honorary membership in the association was instituted with a membership fee of $20, and the fees so obtained were set aside as a sinking fund for the purpose of establishing a library, and a committee consisting of James A. Fee, Fred R. Mellis and Jesse Farling was created under the designation of a "library committee."

On March 27, 1894, Judge Fee, in an interview with a reporter of the East Oregonian newspaper, urged the formation of a public library in Pendleton, under such auspices as should secure permanency, and suggested tentatively that the Commercial Association should take the matter up and devote a certain sum to the support of it as well as to the augmentation of the volumes upon the shelf. He suggested that no member then active in the organization would be any the less attracted to the rooms of the association, and that no doubt many others would become members because they would, then know that the fees and dues would go to the support of an institution which was broad and reaching out to build up the community in a literary as well as social and business way. If the association could not do this, then he suggested that some other nonsectarian institution, which all citizens might join with in building up a creditable library, should undertake the work. The suggestion was approved editorially as one which should be acted upon to the end that Pendleton might have a public library.

On March 31, 1894, a social organization known as the "Columbian Congress" held a banquet, at which the sum of $75 over expenses was realized and at the motion of Judge Fee this sum "was turned

over to the Commercial Association to be used as a nucleus in starting a reference library for the use of the city.''

On May 1, 1894, the library committee reported to the association that they had secured subscriptions in the sum of $600 and asked the association for instructions in regard to the plan of carrying on the library work. They were given a vote of thanks and directed to formulate a plan for carrying on the library and directed to report at the next meeting.

On May 4 or 5, 1894, a library festival was held in aid of the library. In the papers of that date the event is spoken of as having been brought about by the labors of the ''Commercial Association Library Festival Committee, Messrs. Fee, Mellis and Failing.'' The testator, Mr. Sturgis, presided and about $1,700 in money and books was subscribed. The newspaper article congratulated the city on the fact that Pendleton had a library promised and the means of securing it assured.

At a meeting of the association on June 12, 1894, it was moved and carried that the secretary be instructed to prepare an amendment to the by-laws making the library committee a permanent one, but there is no record that this was ever done.

On November 6 and December 4, 1894, the committee reported progress and on January 9, 1895, reported the purchase of books and the preparation of shelves. On February 12, it was moved and carried that the library be insured for $1,000. On March 5, 1895, it was moved and carried that members of the association pay no fees or dues to the library in consideration of the association bearing its expenses, and at the same meeting it was ordered that the library committee be empowered to

96 Or.—33

adopt such rules and regulations as are necessary to conduct the affairs, and that Colonel Boyd be added to the library committee, and that the library be opened on the succeeding Monday.

On March 9, 1895, rules and regulations governing the control of the library were promulgated by the library committee. These rules, as a whole, are similar to those governing all public libraries but contain provisions, which, standing by themselves would seem to rather favor defendant's contention that the Commercial Association was merely the' host so to speak of another association called the "Library Association." The rules are entitled, "Library Rules and Regulations under which books may be read and taken from the rooms."

The provisions above alluded to are as follows:

"1. The Commercial Association agrees to furnish a room for library purposes and a room in which members of the Library Association may read during the afternoon of each day from two o'clock until five, except Sundays, legal holidays and days upon which special meetings of the Commercial Association may be called, and to furnish lights, fuel and a supply of current literature for library purposes, and to pay a librarian for caring for said library, and as a consideration for the benefits of the library the members of the Commercial Association, both active and honorary, who are in good standing, shall be entitled to membership in the Library Association, without the payment of any additional dues or fees.

"2. Any person of good moral character and deportment shall be entitled to membership in said Library Association upon the payment of $2.50 initiation fee, and 25 cents monthly dues payable monthly in advance."

Judge Fee, who took a prominent and perhaps the leading part in procuring subscriptions of money

and books for the library, states that according to his recollection of the circumstance, a contract was drawn at the same time the rules were prepared, whereby the Commercial Association agreed to furnish rooms, light, janitor and librarian services, and for that concession the members of the Commercial Association became members of the Library Association without payment of other dues or fees, while other persons not members of the Commercial Association were required to pay a membership fee of $2.50 and 25 cents a month as dues. His view and recollection of the whole matter may be summed up in the following excerpt from his testimony on cross-examination:

"Q. Then the minutes of March 6, 1900, * * appears: 'President Fee appointed the following committee, Library committee, Guernsey, Boyd, Foster, Lowell and Smith,' Would you say that was true?

"A. Yes, sir; I think possibly that is true but that is nearly six years after the library was founded, Colonel, however, being President of the Association didn't change my views as to the Sturgis books and didn't change my views that the Commercial Association did not own that library, but that it belonged to the people of the city of Pendleton who had paid for it.

"Q. After that was your view of it, or if that was your view of it, why was it being conducted and under what arrangement was it being conducted by the Commercial Association?

"A. I have explained that, Colonel, we got together and as the result of a conversation between myself and Mr. Sturgis the movement was started and after it had gotten along further and it became a thing to be dealt with on behalf of the public, the committee was appointed to solicit funds and it was then understood that the library belonged to the people and was to be a public library and that at Mr. Sturgis' suggestion, as I recall it, the contract I

mentioned and the rules and regulations were prepared. Now as I intended to say, if I have not said it, Mr. Sturgis was a man of wide business experience and lest there should be any misunderstanding with the people who had originated the founding of the library he suggested that a contract be prepared, which I think was prepared and which was signed. As to the legal matters, whether myself and the other members on the library committee could enter into a contract with the Association at that time on behalf of the public is a question for the court. I thought we had that power and that is the capacity in which we were undertaking to act.

"Q. It is your contention there was a contract in existence between some one representing the Commercial Association and some one representing the general public whereby this arrangement was entered into?

"A. That is my recollection of having dictated that contract to Mr. Wheeler and that it was signed at the same time that the rules and regulations were dictated to go with that contract, and I think I stated in my remarks at the hall in 1908 at the time the library was transferred to the city hall, that the Commercial Association agreed to furnish rooms, light, janitor and librarian service and for that the members of the Commercial Association became members of the Library Association and other persons were required to pay two dollars and a half under the rules to become members of that Association, and to pay a monthly due of twenty-five cents for access to the library and that that is the way in which I have always believed that the two independent organizations existed, one representing the Library Association and being the Library Association which was the committee in the Commercial Association, and the Commercial Association itself being the other party."

No contract of the character mentioned is found in the papers of the Commercial Association and Judge Fee kept no copy; neither is there anything

in the records or files of the Commercial Association indicating its assent to or authorization of such a contract. Judge Fee's recollection as to who signed the contract is indistinct, and while his word imports absolute verity so far as his recollection of a transaction occurring a third of a century ago extends, it is the experience of all of us that vague memories are unsafe as evidence, and in this case it is more than possible that the witness has confounded the preparation of the rules with the preparation of a contract, especially as the resolution under which the library committee acted, authorized them to prepare rules and regulations for the conduct of the library but made no reference to any contract with anybody.

It is difficult to see how the committee of the Commercial Association could contract with itself, or how any officer of the association could contract for the association without express authority and evidence of the making of such a contract would, at best, be only valuable as indicating the idea and intent of persons active in the matter, as to who were the real owners of the library. The same may be said as to the testimony of the many witnesses introduced, as to their understanding of the situation when donations for the benefit of the library were made.

A large number of witnesses who were in a position to know, including officers' and charter members of the Commercial Association, and the widow of the testator, testified that their understanding had always been that the library was the property of that association. A less number, though with equal means of knowledge, testified that their understanding was that the library was the property of the peo-

ple of the City of Pendleton, and that they would not have made the donations had they understood that the Commercial Association was to be the owner of the books. The fact is apparent that little thought was in fact given by subscribers to the fund and donors to the library as to what body was to be the technical legal owner of the library. The Commercial Association was composed of the leading citizens of Pendleton and had the confidence of the public. When it assumed to take the lead in organizing a library everybody was satisfied that it would act fairly by the public, and that irrespective of the question of technical ownership the public under reasonable rules and restrictions would have access to it.

No one seems to have expected that the library would be a free library in the sense that everyone could have the use of it without money and without price, and, although from the beginning the rules promulgated required the payment of a membership fee and dues, we hear of no objection to this requirement.

There were no officers or agents of the library selected by the public, or any association of the public, except the Commercial Association. It appointed the library committee and the librarian and reports were made to it. It insured the books. If it was not the owner of the legal title it is difficult to say where that title was lodged. It could not reside in the committee appointed by the association, nor in the librarian who took care of the books, nor the janitor who swept the rooms and dusted the shelves. It was not in the persons who contributed the money to purchase books, or in those who donated books; each one of these, when he made his contribution

and parted with possession of the thing contributed, was divested of the legal title thereof. He could not sue in his own name to replevin the books contributed, even from an outright thief. The Commercial Association might sue, and so far as we can see it was the only party who could have sued. In its capacity as an association it could own a library but by a long series of decisions, which seem to have crystallized into law, it could not be the trustee of a library for the use of someone else.

4. From all the testimony the salient points of which we have attempted to indicate, we conclude that the Commercial Association had a library at the time the will was made. It was certainly the owner of the books contributed by Mr. Jackson before any other contribution was made, and we are of the opinion that the weight of the evidence indicates that the bulk of the contributions thereafter made, were intended to be to the Commercial Association, with the expectation that it would apply them to the upbuilding of a library to which the citizens of Pendleton would be permitted to have access. The name which the library received is not material. It was sometimes called the Commercial Association Library, but most frequently the "Pendleton Public Library," a name which was probably suggested by the testator who was active in promoting it. The library was public and was located in Pendleton and the name was appropriate, but giving that name did not dedicate it to the free use of everybody nor transfer the title to the municipality.

We conclude that at the time the testator made the will in question, there was in the City of Pendleton a library owned by the "Commercial Association of Pendleton," and that it was the intention of the tes-

tator to make that library the beneficiary. As before remarked, there is no ambiguity on the face of the will. It can only be rendered ambiguous by assuming that the Commercial Association of Pendleton had no library and that therefore the testator must have intended the bequest to apply to some other institution. If the association had a library, whether of twenty or twenty thousand volumes, the bequest must stand as written and as we have attempted to show it did have a library, and it is evident from the concluding clause of the bequest, which made it contingent upon the continued existence of the Commercial Association, that this library was in the mind of the testator when he made his will and that there was probably in his bequest the double motive, first to make the association—of which he was an enthusiastic member—attractive and interesting, and, second, to benefit the community which was enjoying the benefit of the library already installed, and perhaps further to insure the permanency of both the Commercial Association and the library.

But it is useless to speculate upon the motives which may have influenced the testator in making the bequest. There was in existence in Pendleton a library of the character described in the will and that fact being ascertained, it follows as a necessary consequence that we cannot divert the bequest to some other institution. It is very probable that were the testator making his will to-day, or if it had been made in 1908, the present library of the City of Pendleton would have been the benficiary, but we are dealing with the situation as it appeared to the testator in 1896, and viewing that situation in the light of the evidence we are of the opinion that the

library of the Commercial Association, the library then in its rooms and to which we find it had the legal title, was the one for the benefit of which the trustees were required to expend the income from the bequest.

Concerning the propriety of removing the library from the rooms of the association to the city hall and thereafter to the Carnegie Library building, we express no opinion. Perhaps these removals were the best that could have been done under the circumstances, and it is possible that if the last removal had been made openly much of the exasperation and ill-feeling, which has crept into this contest, would have been avoided.

We find that the Commercial Association of Pendleton is entitled to the custody of the books removed from the Commercial Association's rooms to the city hall, and to all books since purchased with funds from the Sturgis bequest.

The fact that the association consented to the removal of the books to the city hall does not, from the evidence, appear to have been a gift or a relinquishment of title, but a mere expedient to place the library in a place where it would be more accessible to the public, and the fact that since that time the Commercial Association has not interfered in its management, must be referred to the conditions under which the books were obtained in the first place. There is no convincing, if indeed any, evidence of an intent on the part of the association to make a gift of these books to the City of Pendleton, and under the circumstances there was no necessity for it to interfere in the management of the library in its new location.

5. We do not interpret the will as requiring the trustees to pay over the income of the fund to the Commercial Association, or its library committee, to be by them expended. The bequest is to the trustees, and we think it was the intention of the testator that *they* were the persons who should use the fund for the benefit of the library. If in their judgment, it seemed proper to turn the income over to the association, or its library committee, to be in that way expended for the purchase of books or supplies, they had a right to do so; but we are of the opinion that if such a course should seem best, the trustees themselves had a right to select the books or supplies and to purchase them. The trustees were both gentlemen of more than ordinary literary acquirements and therefore well qualified to appraise the needs of the library and to select accordingly; they were close friends of the testator and the fact that he selected them as trustees, instead of making his bequest to the association itself, or providing that the funds should be managed by trustees selected by the institution, or by its library committee, indicates that he intended that they were the persons in whose judgment the testator intended to place discretion as to the expenditure of the money derived from the income of the fund created. The language of the bequest supports the construction above indicated, "the annual income derived therefrom to be used by them (the trustees) for the benefit of the library," etc.

6. Another contention arises over the construction of the words "annual income." It is contended by plaintiffs that these words indicate that it was the intention of the testator to require the trustees to expend the income annually for the benefit of the

library. We are of the opinion that it was the intention of the testator that the income should be applied annually and not hoarded. There is a dearth of authority on this subject and we have not been able to find any case in which the phrase has been construed in connection with a case arising out of a bequest, although the tendency of the courts seems generally against permitting accumulations unless specifically provided for in the will. The question is difficult of solution upon precedent.

A case similar in principle is that of *Catlin* v. *Lyman*, 16 Vt. 44, in which it is provided that the maker of a promissory note would pay the sum stated in ten years "with annual interest," and on behalf of the maker it was contended that the word "annual" used as an adjective was intended to modify interest, and meant only the computation of interest by annual rests, and that the whole amount, principal and interest, did not become due until ten years from date; but it was held that the contract would not be so construed, but that "annual interest" in legal contemplation was the same as if written "interest annually," and that the interest on the note was due and payable each year.

The same principle seems applicable here, and was evidently so understood by the trustees who honored the requisition of the library committee for books, until a misunderstanding arose to which we shall presently advert. We conclude that it was the duty of the trustees to apply the income of the fund annually to the needs of the library so long as it should be maintained by the association, or until it had ceased to exist. This conclusion suggests difficulties and is one upon which courts might differ, but taking into consideration the general rule as to the vest-

ing of bequests, and the particular circumstances existing at the time the will was executed, we conclude that the construction we have adopted expresses the intent of the testator. This leads to an affirmance of the decree, except so far as it allows the *cestui que trust* to select the books.

7. Another question arises as to costs and as to that we think it would be unfair to compel the defendant, who has, from his point of view, only striven to protect the fund, to pay the expense of defending this action. His management has been painstaking and admirable. In his hands, in addition to a considerable expenditure for books, the fund has trebled in amount. He has given his time and credit to increasing and protecting it. His motives have been misconstrued and his integrity assailed for doing what he has no doubt thought his dead friend desired him to do in relation to the matter, and the association no doubt will now be able to secure a better library than if it had received the annual driblets from an uncertain income.

In addition to this he had learned from Colonel Boyd, his cotrustee, that about $400 of the library fund of the association had been transferred to the general fund and this impression, whether well or ill founded, seems to have created some distrust as to the proper application of the bequest by the library authorities. It is due to the association to say that there is no direct evidence that the conversion ever took place or that if it did it was in any way a breach of trust or of its professions to those who had aided in building up the library.

There is one transaction which, unexplained, probably impressed the mind of Colonel Boyd and afterwards, when he reported it to Judge Fee, also raised

a suspicion in his mind that the funds dedicated to the use of the library were being expended for other purposes, and that circumstance appears on the record as follows: In April, 1894, when the question of establishing a library was being discussed, and before any large contributions for that purpose had been made, a by-law was passed providing for the admission of honorary members of the association at a fee of $20, which fees were to constitute a sinking fund for the purpose of establishing a library. This was in April, 1894. In November, 1896, several months after this bequest became effective by the death of the testator in February of that year, it was resolved by the association that the sinking fund be abandoned and the money turned into the general fund. This, on the face of it, would appear to have been a breach of faith with the testator, and other contributors, and while the transaction may have been perfectly fair and proper it has not been explained in the testimony and is possibly the transaction discussed by Colonel Boyd and reported to Judge Fee, and which caused him to withhold further contributions to the fund from the proceeds of the testator's bounty.

In any event we are satisfied that he did not act in bad faith but upon his honest convictions and with the intent to carry out the desires of the testator, as he understood them. This has not been so plain a case that this court has been able to decide it at first blush or indeed except with the most careful deliberation, and the trustee—with one part of the community demanding the application of the fund to one library, and another group of citizens to another—ought not to be mulcted in costs because he

waited for the advice of the court as to how he should apply it.

The decree will therefore be modified in so far as it provides for the recovery of costs from the defendant, and with the exception of the two modifications above referred to, the decree will be affirmed and the defendant directed to apply the accumulated surplus of the fund to the purposes of the library of the Commercial Association of Pendleton.

MODIFIED.

HARRIS, BENSON and JOHNS, JJ., concur.

------

Former opinion modified June 15, 1920.

PETITION FOR REHEARING.

(190 Pac. 339.)

On petition for rehearing. FORMER OPINION MODIFIED AND REHEARING DENIED.

*Messrs. Raley & Raley,* for respondents and for the petition.

*Mr. James A. Fee, Mr. R. W. Montague* and *Mr. Stephen A. Lowell,* for appellants, and also for the petition.

Department 1.

McBRIDE, C. J.—8. In our original opinion we held, after disposing of the question of costs as to the trustee, that the accumulations of the fund should be applied to the purchase of books for the library of the Commercial Association of Pendleton.

Upon petitions for rehearing filed by both parties, we find this practical difficulty in the way of carrying out such a decree: The amount now accumulated, not including the principal, aggregates more than double the amount of the original fund. To use this large sum at once for the purchase of books would be to fill it with editions which would soon be superseded, and leave the library to depend on the small income provided by annual interest on the original $5,000 bequest for its support.

This being the case, it is the part of prudence to act with reference to conditions as they are, rather than to attempt the impossible task of enforcing the technical terms of the will. We say impossible, because the will substantially provided that the accumulations of the fund should be expended annually, and, owing to this controversy as to who was the beneficiary, such expenditure was halted; the accumulations were not expended annually, or at all for several years; hence the large sum now on hand.

We are of the opinion, under the circumstances, that it would be to the best interest of the library fund to add these accumulations to the principal, with certain deductions hereafter mentioned, and to treat the whole amount so accruing as principal, and apply the income thereafter arising annually to the purchase of books and supplies for the library. This course will furnish a larger annual income for the use of the library hereafter, and seems to us a much better business proposition than putting the whole sum now on hand immediately into the purchase of books.

From the accumulated income now on hand, it will be directed that $1,200 be applied during the current year, ending December 30, 1920, for the purchase of

books and such other supplies as the trustee may deem proper. In addition, it is ordered that the plaintiffs be paid from the fund $300 as attorneys' fees. The trustee, being somewhat in the position of a stakeholder between the city and the Commercial Association in this litigation, should not be required to pay his attorney wholly from his own funds, and will be allowed to compensate himself to the extent of $250 from the accumulations to the fund. The plaintiffs will have a decree against the city for their costs and disbursements herein to the extent of $150, or such lesser sum as may be taxed, otherwise the decree will be as indicated in our original opinion.

This disposes of the case, and we trust the animosities that this controversy has engendered will now be laid aside, and that all parties to it will work together to make the bequest of Mr. Sturgis an instrument of good in the community which he so generously remembered in his hours of sickness and in the shadow of impending death.

FORMER OPINION MODIFIED AND REHEARING DENIED.

HARRIS, BENSON and JOHNS, JJ., concur.